UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHAD KAISER, individually,
and RENEE KAISER, individually
and as Conservator for K.K., a minor,

                    Plaintiff,                    Case No. 1:20-cv-12903

v.                                         Honorable Thomas L. Ludington
                                         United States District Judge
JAYCO, INC.,

                    Defendant.
_____/

**OPINION AND ORDER (1) GRANTING AND DENYING IN PART DEFENDANT'S
MOTION TO EXCLUDE UNDISCLOSED WITNESS, (2) GRANTING AND DENYING
IN PART DEFENDANT'S MOTION TO EXCLUDE MEDICAL EXPERT, (3) DENYING
DEFENDANT'S MOTION TO EXCLUDE HUMAN-FACTORS EXPERT, (4) DENYING
IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND (5)
DIRECTING PARTIES TO FILE SUPPLEMENTAL BRIEFING**

During a summertime visit to his uncle's property, four-year-old K.K. sustained a severe

laceration on his neck from the metal trim on his uncle's RV. His parents, Chad and Renee Kaiser,

brought this action against the RV's manufacturer, Jayco, Inc., alleging products liability and

negligence.

Defendant has filed motions (1) to exclude Plaintiffs' undisclosed lay witness, (2) to

exclude Plaintiffs' medical expert, (3) to exclude Plaintiffs' human-factors expert, and (4) for

partial summary judgment on (a) the applicability of Michigan's products-liability statute, (b)

Plaintiffs' claim for failure to warn, and (c) Plaintiffs' claim for negligent infliction of emotional

distress.

For the reasons stated hereafter, Defendant's motions to exclude Plaintiffs' medical expert

and undisclosed witness will be granted and denied in part, Defendant's motion to exclude

Plaintiffs' human-factors expert will be denied, and Defendant's motion for partial summary judgment will be denied except as to the issue of Michigan's products-liability statute, which will be held in abeyance pending supplemental briefing.

## I.

One afternoon in July 2020, K.K. and his father went to visit K.K.'s uncle, Bennie Schultz, at his house in Alpena, Michigan. *See* Am. Compl., ECF No. 20 at PageID.89. Parked on the property was Mr. Schultz's 2018 Jayco Eagle fifth-wheel RV, which came equipped with a slide-out living room. *Id.* A popular feature, activating the slide-out causes the RV's interior to expand several feet. *Id.* But activating the slide-out has another effect not noted in the owner's manual. When closed for driving, the slide-out is secured to the RV with metal trim that curves several inches under the RV. *See* RV Photos, ECF No. 42-1 at PageID.1527. But when activated, the slide-out and its curved trim disconnect from the RV, exposing a sharp metal edge located just a few feet above the ground. *Id.*

During their afternoon visit, Mr. Kaiser and Mr. Schultz chatted on one side of the RV while K.K. and his three-year-old cousin, M.S., played on the other side. *See* Schultz's Dep., ECF No. 38-2 at PageID.877. The two children were riding in a Power Wheels battery-operated buggy made to seat two children. *Id.* at PageID.870–71; ECF No. 42-1 at PageID.1526. At some point, a third child approached K.K. and M.S., sat on the hood of the buggy, and demanded a ride. *See* Mr. Kaiser's First Dep., ECF No. 38-1 at PageID.818. In an apparent attempt to dislodge the third child, M.S. quickly reversed the buggy. *Id.* at PageID.821–22. Although it is unclear whether she intended to do so, M.S. reversed underneath the slide-out, causing K.K., who was sitting passenger, to cut his neck on the metal trim. *Id.* at PageID.821–22.

Neither Mr. Kaiser nor Mr. Schultz saw the accident, but both men ran over when they heard a "thump" and K.K. screaming. *Id.* at PageID.816. They found K.K. lying on the ground next to the slide-out, bleeding from a nearly three-inch long gash on the side of his neck. *Id.* at PageID.816, 823. Mr. Kaiser rushed K.K. to the local hospital, where he was flown to Ann Arbor for emergency surgery. *Id.* at PageID.831. Remarkably, the surgeons found no vascular injury and were able to repair K.K.'s transected tissue. *See* Medical Records, ECF No. 38-11 at PageID.1174.

Four months later, Plaintiffs brought this action individually and on behalf of K.K., alleging three products-liability claims—negligent design, negligent failure to warn, and breach of warranty—and one claim for negligent infliction of emotional distress (NIED). ECF Nos. 1; 20. In Plaintiffs' view, Defendant should have omitted the sharp trim from its design, provided a protective guard for the trim, or at least issued a warning. ECF No. 20 at PageID.90–91.

Since the close of discovery, Defendant has filed motions to (1) exclude an undisclosed witness, (2) exclude Plaintiffs' medical expert, (3) exclude Plaintiffs' human-factors expert, and (4) for partial summary judgment as to (a) the applicability of Michigan's product-liability statute (b) Plaintiffs' failure-to-warn claim, and (c) Plaintiffs' NIED claim. ECF Nos. 33; 37; 38; 44. Defendant does *not* seek summary judgment on Plaintiffs' claims for defective design or breach of warranty. ECF No. 38 at PageID.757.

Having reviewed the parties' briefing, this Court finds that a hearing is unnecessary and will proceed to address Defendant's motion on the papers. *See* E.D. Mich. LR 7.1(f)(2).

## II.

First, Defendant seeks to exclude the testimony of a lay witness that Plaintiffs disclosed for the first time two weeks after discovery closed. ECF No. 33 at PageID.227. The witness, Dan Pavlansky, is the chairman of Hibo Foam Plastics, a company that manufactures foam guards for

the metal trim on RVs. *Id.* Pavlansky is expected to testify that metal trim is a well-known hazard in the RV industry and that he and Defendant's employees attended the same RV tradeshows. *Id.*; ECF No. 35 at PageID.331–32. Plaintiffs disclosed Pavlansky on September 17, 2021, two days after this Court's settlement conference. ECF No. 33 at PageID.227.

Federal Rule of Civil Procedure 26 requires parties to make certain "initial disclosures" shortly after the initial scheduling conference. *See* FED. R. CIV. P. 26(a)(1)(C) (requiring initial disclosures "at or within 14 days after the parties [scheduling] conference unless a different time is set by stipulation or court order"). As relevant here, parties must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i). Rule 26 also imposes an ongoing duty to supplement and correct initial disclosures. FED. R. CIV. P. 26(e)(1). A party that does not timely disclose information or a witness "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

The Sixth Circuit considers five factors to determine "whether a party's omitted or late disclosure is 'substantially justified' or 'harmless'":

> (1) the surprise to the party against whom the evidence would be offered;
> (2) the ability of that party to cure the surprise;
> (3) the extent to which allowing the evidence would disrupt the trial;
> (4) the importance of the evidence; and
> (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 397 (4th Cir. 2014)).

Here, Plaintiffs' counsel learned of Pavlansky "several days before" deposing two of Defendant's employees on August 24, 2021. ECF No. 35 at PageID.331. Plaintiffs' counsel asked those employees about RV Safe Zone, a company that sells Hibco-manufactured foam guards. *Id.* at PageID.331–32. But both employees denied knowledge of the company. *Id.* Later, during this Court's settlement conference, Plaintiffs' counsel apparently realized that they had not yet disclosed Pavlansky. *Id.* at PageID.332. Two days later, they filed a supplemental disclosure.

Although Plaintiffs' counsel were untimely, the balance of the *Howe* factors weighs against exclusion. *See Howe*, 801 F.3d at 747 (noting that "Rule 37(c)(1) provides the district court with the option to order alternative sanctions 'instead of' exclusion of the late or undisclosed evidence" (quoting FED. R. CIV. P. 37(c)(1))).

*Surprise*. Pavlansky's disclosure was not a complete surprise to Defendant. Although Defendant did not know of Hibco or Pavlansky specifically, two of its employees were asked during deposition about RV Safe Zone. *See* ECF No. 35 at PageID.337. And despite denying knowledge of RV Safe Zone, one of the employees—Defendant's engineering director, Tom Del Vecchio—admitted that he had seen RV users cover the metal trim with modified "swim noodles." *See* Del Vecchio Dep., ECF No. 35-2 at PageID.353. For these reasons, Defendant had reason to know Plaintiffs would attempt to introduce evidence of foam guards at trial, even if it did not know of Pavlansky.

*Ability to Cure*. With trial still five months away, the prejudice to Defendant is curable. Indeed, according to their response brief, Plaintiffs offered to help cure the prejudice by "noticing [Pavlansky's] deposition" shortly after Defendant filed its motion to exclude.[1] ECF No. 35 at PageID.338. Although a deposition alone would not cure the prejudice because Defendant still had

---

[1] It is unclear whether Defendant accepted Plaintiffs' offer.

to bring a motion and might have to update its expert reports, Plaintiffs' offer demonstrates that a remedy other than exclusion is feasible. *See* FED. R. CIV. P. 37(c)(1) (providing that a court may apply other sanctions for nondisclosure "in addition to or instead of [exclusion]").

*Disruption of Trial*. Allowing Pavlansky to testify would not disrupt the trial. ECF No. 35 at PageID.338. As noted, trial is five months away and might not even occur *that* early due to the pandemic-induced backlog. ECF No. 34. Defendant argues that Pavlansky's testimony might disrupt mediation. ECF No. 33 at PageID.240–41. But that argument is moot, as mediation concluded without success in February 2022.

*Importance of Evidence*. Pavlansky's expected testimony is at least moderately significant to Plaintiffs. Although Plaintiffs do not rely on Pavlansky in their summary-judgment response, *see generally* ECF No. 42, his expected testimony supports the notion that Defendant knew or should have known that the RV slide-out was unreasonably dangerous. *See Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 452 (6th Cir. 2013) (noting that plaintiff alleging design defect under Michigan law must show, among other things, that severity of the injury and its occurrence were "foreseeable"). Additionally, Pavlansky appears to be Plaintiffs' only witness who works in the RV industry, which might enhance his credibility before the jury.

*Explanation for Untimeliness*. Plaintiffs' counsel's explanation for the untimely disclosure is both believable and benign: They forgot. *See* ECF No. 35 at PageID.340. Although Defendant casts doubt on that explanation by noting counsel's combined "nine decades of experience," ECF No. 36 at PageID.366, attorneys, like all humans, are fallible—even with 90 years' experience. Simply put, there is no reason to think that Plaintiffs' counsel withheld Pavlansky in order to ambush Defendant at trial. As noted, Pavlansky is not even mentioned in Plaintiffs' summary-judgment response.

For these reasons, the balance of the *Howe* factors weighs against exclusion. *See EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459, 470 (6th Cir. 2019) ("Balancing marginal cases is a classic exercise of discretion."). Still, counsel's untimely disclosure merits a sanction. After all, even if inadvertent, counsel's oversight *did* deprive Defendant of the opportunity to depose Pavlansky and *did* force Defendant to bring this motion. Accordingly, Defendant will be permitted to depose Pavlansky in a manner consistent with the Federal Rules of Civil Procedure, and Plaintiffs will be directed to pay Defendant's reasonable attorney fees and costs in filing this motion and deposing Pavlansky. *See* FED. R. CIV. P. 37(c)(1)(A) (providing that a court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure [to disclose]"). Such costs and fees shall be determined by this Court at a later date.

### III.

Next, Defendant seeks to exclude two of Plaintiffs' experts, Drs. Gerald Shiener and Ruston Hunt, for lack of a reliable basis for their testimony. ECF No. 37 at PageID.375–78; ECF No. 44 at PageID.1896–98.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Simply stated, "[f]or expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *Osborn v.*

*Griffin*, 865 F.3d 417, 452 (6th Cir. 2017) (quoting *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017)).

<strong>A.</strong>

Gerald Shiener, M.D., is a psychiatrist, university professor, and Distinguished Life Fellow of the American Psychiatric Association. *See* Dr. Shiener's Dep., ECF No. 37-4 at PageID.622; Dr. Shiener's CV, ECF No. 40-1 at PageID.1337. For nearly 50 years, Dr. Shiener has evaluated and treated psychiatric patients, including minors. ECF No. 37-4 at PageID.686; ECF No. 40-1 at PageID.1337. In June 2021, Dr. Shiener evaluated K.K. at the request of Plaintiffs' counsel. *See* Dr. Shiener's Report, ECF No. 37-5 at PageID.709. Based on his interview with K.K. and Mrs. Kaiser, Dr. Shiener diagnosed K.K. with post-concussive syndrome (PCS) and post-traumatic stress disorder (PTSD), which he believes were caused by the RV incident. *Id.* at PageID.712.

Defendant does not challenge Dr. Shiener's credentials, and rightly so. By any measure, Dr. Shiener is a distinguished psychiatrist who is more than qualified to render a PTSD diagnosis. *See Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 692 (E.D. Mich. 2004) (holding that clinical psychologist was qualified to testify regarding PTSD diagnosis despite lack of experience with PTSD patients). Instead, Defendant challenges the factual and methodological basis for Dr. Shiener's conclusions.

<strong>i.</strong>

First, Defendant argues that Dr. Shiener's PCS diagnosis is inadmissible for lack of a reliable factual basis. ECF No. 37 at PageID.380–81. Dr. Shiener diagnosed K.K. with PCS based on the assumption that K.K. suffered a head injury. *Id.* But, as Defendant notes, there is no record evidence of a head injury, only of a neck laceration. *Id.* Defendant's argument is persuasive.

- 8 -

"[A]n expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (quoting *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995)). Accordingly, "whe[n] based on assumed facts, [an expert's opinion] must find some support for those assumptions in the record." *Id.* (citing *Shaw ex rel. Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990)).

Here, Dr. Shiener assumed that K.K. suffered a head injury based solely on his recollection of what Mrs. Kaiser said during the evaluation. *See* ECF No. 37-4 at PageID.654–55 ("I have in my report he bumped his head. She used the term 'bumped his head.'"). But Mrs. Kaiser did not witness the incident and, by her own admission, does not know whether K.K. hit his head. *See* Mrs. Kaiser's Dep., ECF No. 37-3 at PageID.552–53. Additionally, K.K.'s medical records do not mention any head injury and consistently describe his mental state as normal. *See* ECF No. 37-4 at PageID.661–74.

By all appearances, Dr. Shiener's PCS diagnosis is based on a miscommunication between him and Mrs. Kaiser. For that reason, it must be excluded.

**ii.**

Next, Defendant argues that Dr. Shiener's PTSD diagnosis is inadmissible for lack of a reliable diagnostic method. ECF No. 37 at PageID.388.

In addition to verifying that an expert opinion is based on "sufficient facts and data," a court must also verify that the opinion is the "product of reliable principles and methods" that were "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. In the seminal *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court identified several factors that courts may consider in assessing whether an opinion is the product of reliable

principles and methods, including whether the expert's methods are testable, subject to peer review, or "generally accepted." 509 U.S. 579, 592–95 (1993). Yet the *Daubert* factors "do not constitute 'a definitive checklist or test'" and do not apply in every case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

To diagnose K.K., Dr. Shiener used a familiar diagnostic method known as "differential diagnosis," through which a physician "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Hardyman v. Norfolk & W. Ry.*, 243 F.3d 255, 260 (6th Cir. 2001) (quoting FED. JUD. CTR., *Reference Manual on Scientific Evidence* 214 (1994)). In applying that method, Dr. Shiener relied on his training, experience, and first-hand observations of K.K., whom he described as unusually "clingy," "anxious," and "uncomfortable." *See* ECF No. 37-4 at PageID.676, 680–81, 686, 698. Those observations, Dr. Shiener explained, were particularly significant here, as children have only a limited ability to verbalize their emotions. *Id.* at PageID.676; *see also id.* at PageID.636 (describing a moment in which K.K. apparently buried his face in his mother's skirt at the mention of the RV incident). Based on his observations and Mrs. Kaiser's description of K.K.'s post-injury behavior—including sleep disturbances—Dr. Shiener diagnosed K.K. with PTSD.

Defendant argues that Dr. Shiener's methodology was flawed for two reasons. First, Defendant argues that Dr. Shiener should have reviewed the records from K.K.'s hospital admission and subsequent treatment. *See* ECF No. 37 at PageID.384–85. But Defendant has not explained why those records are relevant to Dr. Shiener's PTSD diagnosis. Unlike the PCS

diagnosis, the PTSD diagnosis does not rely on assumed or disputed facts. *See supra* Section III.A.i. Rather, it relies on Dr. Shiener's first-hand observations of K.K. and the medical history that Mrs. Kaiser provided. Presumably, a physician can obtain a "thorough medical history," as required for differential diagnosis, *see Hardyman*, 243 F.3d at 260, without reviewing irrelevant records.

Second, Defendant clams that Dr. Shiener wrongfully ignored certain diagnostic criteria in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th. ed. 1994) (DSM-IV).[2] *See* ECF No. 37 at PageID.388–91.

The DSM-IV is widely understood to reflect reliable diagnostic criteria.[3] *See Tardif v. City of New York*, 344 F. Supp. 3d 579, 600 (S.D.N.Y. 2018) (collecting cases). Yet during his deposition, Dr. Shiener acknowledged that he did not rely solely on DSM criteria when diagnosing K.K. *See* ECF No. 37-4 at PageID.627–28. In his view, the DSM-IV—and other committee-designed texts—are "informative" but not "authoritative." *Id.* at PageID.627. Rather than providing binding diagnostic standards, the DSM-IV and other texts provide "guidelines." *See id.* at PageID.683. According to Dr. Shiener, psychiatric diagnosis is more about the exercise of "clinical judgment" based on a patient's symptoms and medical history than about applying the DSM like a "book of statutes." *Id.* at PageID.685.

Defendant does not grapple with Dr. Shiener's critical yet informed approach to the DSM. Instead, it argues that Dr. Shiener *must* adhere to the DSM-IV under the Sixth Circuit's decision in *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir. 1988). In *Sterling*—decided five

---

[2] Confusingly, Defendant's motion recites diagnostic criteria from the DSM-III, not the DSM-IV. *See* ECF No. 37 at PageID.388–90.

[3] In 2013, the American Psychiatric Association published the DSM-V. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013). Yet for some reason, neither side cites this newer version of the DSM in their briefing.

years before *Daubert* and six years before the DSM-IV—the Sixth Circuit reversed a damages award for PTSD because the plaintiffs did not "satisfy all of the criteria necessary for a [PTSD diagnosis]" as provided in DSM-III. *Id.* at 1209–10; *see also id.* at 1210 (noting that drinking contaminated water was not a "recognized stressor" for diagnostic purposes). But *Sterling* concerned the propriety of a district court's damages award. *See id.* at 1209. It did not address the admissibility of expert testimony or the narrow issue presented here: whether a psychiatrist's PTSD diagnosis is admissible even though he did not strictly rely on the DSM's diagnostic criteria.

The Ninth Circuit, by contrast, has addressed the issue presented here. In *S.M. v. J.K.*, the Ninth Circuit considered whether a magistrate judge abused his discretion by admitting a psychiatrist's PTSD diagnosis because the psychiatrist "did not rely strictly upon the revised third edition of the DSM." 262 F.3d 914, 920–21 (9th Cir. 2001). Noting a trial court's "broad discretion" under *Daubert*, the Ninth Circuit explained that "a court may admit somewhat questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *Id.* at 921 (quoting *Kumho*, 526 U.S. at 153). And because psychiatrists often disagree "even on major diagnostic categories such as schizophrenia," a psychiatrist's "variance from the DSM's diagnostic criteria will not automatically result in an unreliable diagnosis." *Id.* (quoting Christopher Slobogin, *Doubts About Daubert: Psychiatric Anecdata as a Case Study*, 57 WASH. & LEE L. REV. 919, 920 (2000)). Instead, a psychiatrist's deviation from the DSM goes to the weight of her testimony and should be explored on cross-examination. *Id.* at 922 (noting that the defendant "had the opportunity to cross-examine [the psychiatrist] about the differences between his diagnosis and the two relevant versions of the DSM").

The Ninth Circuit's reasoning is persuasive. In diagnosing K.K., Dr. Shiener relied on his decades of experience as a psychiatrist, extensive knowledge of the PTSD literature, and personal observations of K.K.'s behavior. *See* ECF No. 37-4 at PageID.680–81, 685–86. Although relevant to the weight of his testimony, Dr. Shiener's apparent deviation[4] from the DSM does not render his opinion unreliable. *See S.M.*, 262 F.3d at 921–22; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Accordingly, Dr. Shiener may testify regarding K.K.'s PTSD diagnosis at trial. Conversely, Defendant may explore Dr. Shiener's alleged deviation from the DSM-IV during cross-examination.

## B.

Defendant also seeks to exclude the testimony of Dr. Ruston Hunt, a human-factors engineer[5] and former engineering professor at Kennesaw State University. ECF No. 44; Dr. Hunt's CV, ECF No. 46-1 at PageID.2199. Dr. Hunt holds a Ph.D. in mechanical engineering from the University of Illinois, where he also completed his master's and bachelor's degrees in industrial engineering. ECF No. 46-1 at PageID.2199–2200. For approximately 30 years, Dr. Hunt has

---

[4] Despite his criticism of the DSM, Dr. Shiener maintains that his opinion was generally consistent with the DSM criteria. *See* ECF No. 37-4 at PageID.676–81.

[5] As defined by the International Ergonomics Association, "Ergonomics (or human factors) is the scientific discipline concerned with the understanding of interactions among humans and other elements of a system, and the profession that applies theory, principles, data, and methods to design in order to optimize human well-being and overall system performance." *What is Ergonomics?*, Int'l Ergonomics Ass'n, https://iea.cc/what-is-ergonomics/ [https://perma.cc/XP8S-UQFN]. Human-factors engineers are frequently consulted in failure-to-warn cases. *See, e.g.*, *Kines v. Ford Motor Co.*, No. 119CV01054JDBJAY, 2020 WL 5217408, at *3–5 (W.D. Tenn. June 29, 2020) (holding that human-factors expert could reliably testify regarding adequacy of manufacturer's warnings).

specialized in human-factors engineering with an emphasis in the design of product warnings and instructions. *See* Dr. Hunt's Report, ECF No. 44-5 at PageID.2166–67.

In this case, Dr. Hunt conducted what he called a "human-factors engineering analysis" of the RV incident. *Id.* at PageID.2166. He began by reviewing the RV's owner manual and 220 photos of objects involved in K.K.'s injury, including the RV, the slide-out, and the buggy in which K.K. was riding. *Id.* at PageID.2168. He then applied a nine-step analysis adapted from a military safety standard. *Id.* at PageID.2170. As part of that analysis, Dr. Hunt "identif[ied] hazards," "consider[ed] whether hazards c[ould] be mitigated by following the hazard control hierarchy," and "consider[ed] the need for, and viability of, warnings, instructions, and/or other collateral materials."[6] *Id.* at PageID.2170–76. In the end, Dr. Hunt formed several opinions:

> 1. The sharp edge under the popout of the Jayco trailer poses a significant hazard to anyone who might intentionally or inadvertently access the significant amount of space under the popout.
> 2. The sharp edge hazard could and should have been recognized by Jayco.

---

[6] The nine steps are listed in Dr. Hunt's report as follows:

1. Identify hazards
2. Consider whether hazards can be eliminated or mitigated by following the hazard control hierarchy.
3. Consider the need for, and viability of, warnings, instructions, and/or other collateral materials.
4. Consider existing labels, warnings, instructions and other collateral materials to determine if hazards are adequately identified and if so, how warning information is conveyed to affected parties.
5. Consider similar products and processes to establish the state of the art for product and process design.
6. Consider pertinent training materials
7. Consider the behavior of the individual(s) involved.
8. Consider relevant applicable regulations.
9. Consider standards within the industry and generic industrial standards (a.k.a. voluntary or consensus standards).

ECF No. 44-5 at PageID.2170.

3. Jayco could and should have eliminated, mitigated or at least communicated the presence of the sharp edge hazard via on product warnings and in the Owner's Manual.[7]
4. As it was marketed and sold, the 2018 Jayco Eagle Fifth Wheel trailer was unreasonably dangerous.

*Id.* at PageID.2177.

During his later deposition, Dr. Hunt expressed another opinion: the proximate cause of K.K.'s injury was not a lack of adult supervision but "an unguarded sharp edge" that was "hidden from view" and "not warned about." ECF No. 44-4 at PageID.2091–92; *see also id.* at PageID.2150–52 (opining that on-product warnings "definitely could have" prevented K.K.'s injury).

As with Dr. Shiener, Defendant does not challenge Dr. Hunt's credentials. Undoubtedly, Dr. Hunt is qualified to offer his opinions in this case. *See Vazquez v. Raymond Corp.*, No. 2:17-CV-20-RWS, 2019 WL 176106, at *2 (N.D. Ga. Jan. 11, 2019) ("Dr. Hunt is clearly qualified to testify generally as a human factors and warnings expert."). Instead, Defendant challenges the factual basis for Dr. Hunt's opinions and the way in which he reached them.

### i.

First, Defendant argues that Dr. Hunt's opinions are inadmissible because he incorrectly assumed that neither Mr. Kaiser nor Mr. Schultz knew of the slide-out trim. *See* ECF No. 44 at PageID.1899–1900. Defendant notes that "Mr. Kaiser acknowledged that children should not play around or under the RV," and that "Mr. Schultz . . . warned both his children and the Kaiser children '[n]ever to go under the camper.'" *Id.* Defendant also notes that Dr. Hunt "did not read any fact witness depositions" and "has not spoken to anyone in the Kaiser or Schultz families." *Id.*

---

[7] As an example, Dr. Hunt provided several sharp-edge warnings in his report. *See* ECF No. 44-5 at PageID.2175. Plaintiffs have not indicated whether they intend to introduce these warnings or others at trial, and Defendant does not mention them in its briefing.

at PageID.1900. Therefore, Defendant concludes, Dr. Hunt did not adequately consider "the human factor." *Id.* at PageID.1901.

Defendant's argument is unfounded. First, there is no evidence that Dr. Hunt's assumption is wrong. Although both Mr. Kaiser and Mr. Schultz knew it was generally unsafe for children to play under the RV, *see* ECF No. 38-1 at PageID.827–28; ECF No. 38-2 at PageID.916, there is no evidence that either parent knew of the sharp metal trim. On the contrary, they both seemed to believe that children could play safely near the RV because it was "family oriented" and "kid friendly." *See* ECF No. 38-1 at PageID.827. In fact, despite having crawled under the RV a "dozen" times for maintenance, Mr. Schultz testified that he never noticed the sharpness of the trim. *See* ECF No. 38-2 at PageID.906–07.

Second, Mr. Kaiser's and Mr. Schultz's knowledge of the trim is relevant only to (1) the obviousness of the danger and (2) causation—that is, whether trim-specific warnings would have prevented K.K.'s injury. *See Laier v. Kitchen*, 702 N.W.2d 199, 205 (Mich. Ct. App. 2005) ("In general, there is no obligation to warn someone of dangers that are so obvious and apparent that a person may reasonably be expected to discover them and protect himself or herself."); *Allen v. Owens-Corning Fiberglas Corp.*, 571 N.W.2d 530, 535 (Mich. Ct. App. 1997) (noting that in a failure-to-warn case, a plaintiff must typically prove that she "would have altered [her] behavior in response to a warning"). But Dr. Hunt has opined on more than notice and causation; he has also opined on Defendant's constructive knowledge of the danger and the feasibility of warnings. *See* ECF No. 44-5 at PageID.2177. Thus, even if Dr. Hunt wrongly assumed that Mr. Kaiser and Mr. Schultz did not know of the dangerous slide-out trim, only a portion of his expected testimony would be undermined.

No doubt, the jury might be inclined to give Dr. Hunt's testimony more weight if supported by witness interviews or an in-person inspection of the RV. But, again, the task here is not to determine whether Dr. Hunt's opinion is correct but to determine whether it rests on a reliable foundation. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530. At most, Defendant has pointed to a weakness in Dr. Hunt's factual foundation, which does not make his testimony inadmissible. *Id.*

### ii.

Next, Defendant argues that Dr. Hunt's opinions are inadmissible because he did not reliably apply several steps in his nine-step analysis.[8] ECF No. 44 at PageID.1901–04. Specifically, Defendant argues that Dr. Hunt did not "determine whether RV users would or could be harmed by [the slide-out trim]" (step one), "analyze whether anyone needed warnings" (step three), "consider any other similar products or trailers" (step five), or "consider the behavior of the individuals involved" (step seven). *Id.* at PageID.1901–02.

Defendant's argument is refuted by the record. Regarding hazard identification (step one), Dr. Hunt identified the slide-out trim as a hazard not on mere "say so" but on the ergonomic principle of "affordance." *See* ECF No. 44-4 at PageID.2118–20. As Dr. Hunt explained, the height of the trim—which Dr. Hunt estimated at two-and-a-half feet above the ground—"affords" an opportunity for certain human interactions, including an adult storing items or a child chasing after a ball. *Id.* In Dr. Hunt's view, manufacturers should be aware of and account for "affordance" in their design. *Id.* For this reason, Dr. Hunt rejects the view that manufacturers must wait for an

---

[8] Notably, Defendant does not challenge Dr. Hunt's nine-step analysis *itself*, only Dr. Hunt's *application* of it. *See* ECF No. 44 at PageID.1903 ("Dr. Hunt's methodology in theory may well be reliable, but his application of it to the facts of this case is not."). For purposes of Rule 702, this Court is satisfied that Dr. Hunt's nine-step analysis is reliably based on his training and well-accepted ergonomic principles.

"injury count" before taking corrective action on an apparent hazard. *Id.* at PageID.2124–25 ("Now, I would agree if we were not aware of [the hazard] or couldn't identify it in some other way, then seeing an injury count might lead us to go investigate. But in this case, we know what the hazard is.").

Regarding the need for warnings (step three), Defendant faults Dr. Hunt for not considering whether Mr. Kaiser and Mr. Schultz knew of the trim. ECF No. 44 at PageID.1902. But Defendant misconstrues the purpose of step three. As Dr. Hunt explained during his deposition, his primary objective at step three was to determine what Defendant "could and should have done," not how "particular adults" with "particular experiences" might have acted. ECF No. 44-4 at PageID.2114. Defendant's point might be relevant in considering causation, but it does not undermine the reliability of Dr. Hunt's opinions.

Regarding the consideration of similar products and processes (step five), Defendant notes that Dr. Hunt did not consider the slide-out trim on other RVs. ECF No. 44 at PageID.1902–03. Even so, Dr. Hunt *did* consider engineering processes that could have been used to reduce the trim's sharpness. *See* ECF No. 44-5 at PageID.2172. Further, Dr. Hunt will not testify regarding alternative designs, so it is unclear why his failure to consider other RVs would undermine his testimony in this case.

Finally, regarding the behavior of the people involved (step seven), Defendant claims that Dr. Hunt disregarded the role of adult supervision in the incident.[9] ECF No. 44 at PageID.1903. On the contrary, Dr. Hunt has expressly acknowledged that adult supervision is an "integral part

---

[9] The adult-supervision aspect has apparently been raised by Defendant's human-factors expert, Dr. Steven Arndt. *See* ECF No. 44-4 at PageID.2085–86 (discussing Dr. Arndt's report). Plaintiffs have not challenged the admissibility of Dr. Arndt, so the exact nature of his expected testimony is unknown.

of industrial engineering." ECF No. 44-4 at PageID.2085. Yet, in his opinion, this was not "a case of poor child supervision or inadequate supervision" but a case of a manufacturer's failure to mitigate an "unguarded sharp edge." *Id.* at PageID.2085, PageID.2091. Indeed, Dr. Hunt specifically rejected the notion that generic parental warnings would have prevented K.K.'s injury:

> Q: Would your opinion be any different if the parents of the children specifically told the children not to go under the slide out or the vehicle?
>
> A: No. As I said before, I think those are what I would call—and I hope this doesn't sound pejorative—but it's motherhood. Those are good things: Be careful, don't go under there, don't run out in the street, don't get out of our sight.
> It's not the same as saying, don't go under this pop-out because there's a sharp edge here that can cut you.

*Id.* at PageID.2115–16.

For these reasons, Dr. Hunt reliably applied his nine-step analysis and may offer his opinions at trial.

## IV.

Having resolved Defendant's evidentiary motions, the analysis now turns to Defendant's motion for partial summary judgment. As previously noted, Defendant seeks summary judgment on three issues: (1) the applicability of Michigan's products-liability statute, (2) Plaintiffs' failure-to-warn claim, and (3) Plaintiffs' NIED claim. ECF No. 38 at PageID.757.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all

reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Each of the three issues for summary judgment are addressed below.

## A.

The first issue is whether Defendant is entitled to summary judgment on the application of Michigan's products-liability statute. As relevant here, Michigan's products-liability statute limits the total amount of noneconomic damages a plaintiff may recover to $280,000.00, "unless the defect in the product caused either the [injured] person's death or permanent loss of a vital bodily function, in which case the . . . [limit is] $500,000.00." MICH. COMP. LAWS § 600.2946a(1).

There are two exceptions: First, "if the trier of fact determines by a perponderance [sic] of the evidence that the death or loss was the result of the defendant's gross negligence," then the $500,000 limitation "for death or permanent loss of a vital bodily function does not apply." *Id.* § 600.2946a(3). Second, "if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge," then there is *no* statutory limit on noneconomic damages. *Id.* § 600.2949a (footnote omitted).

In summary, a plaintiff may not recover more than $280,000 in noneconomic damages in a products-liability action unless (1) the jury finds that "the defect caused either the [plaintiff's] death or permanent loss of a vital bodily function"—in which case the cap is $500,000, unless the defendant was "grossly negligent"—or (2) the court finds that "the defendant had actual knowledge [at the time of manufacture or distribution] that the product was defective and that there

was a substantial likelihood that the defect would cause the injury [in question]." *Id.* §§ 600.2946a, 600.2949a.

Defendant claims that the lower limit of $280,000 applies because Plaintiffs have not shown either (1) that K.K. suffered the permanent loss of a vital bodily function or (2) that Defendant willfully disregarded "actual knowledge" that the slide-out trim was defective and substantially likely to cause K.K.'s type of injury. ECF No. 44 at PageID.769. In response, Plaintiffs argue that there is at least a triable question of fact regarding Defendant's willfulness. ECF No. 42 at PageID.1517–20. Neither side, however, addresses the thornier and more central issue of whether this Court may determine the application of section 2946a before trial.

By its plain language, section 2946a indicates that the court should determine the application of the damages cap *after* the jury has rendered its award:

> (2) In awarding damages in a product liability action, the trier of fact shall itemize damages into economic and noneconomic losses. Neither the court nor counsel for a party shall inform the jury of the limitations under subsection (1). The court shall *adjust* an award of noneconomic loss to conform to the limitations under subsection (1).

MICH. COMP. LAWS § 600.2946a(2) (emphasis added). This interpretation is buttressed by the way in which the two exceptions to the damages cap operate. As the Michigan Court of Appeals has explained, the two exceptions—a jury's finding of gross negligence and a court's finding of willful disregard—"operate independently of each other." *Rodriguez v. ASE Indus.*, 738 N.W.2d 238, 241 (Mich. Ct. App. 2007) (affirming trial court's finding of willful disregard under section 2949a despite jury finding of no gross negligence). So, even if the jury finds that the defendant was not grossly negligent, a trial court may override that finding and allow a plaintiff to recover the full noneconomic-damages award. *Id.* In this way, the Michigan Legislature designed a statute that

contemplates a posttrial adjustment of awarded damages, instead of a pretrial determination of awardable damages.

As further evidence of this design, seemingly every Michigan court to have considered the application of section 2946a has done so during posttrial proceedings. *See, e.g.*, *Rodriguez*, 738 N.W.2d at 240; *Estate of Patel v. Reinalt-Thomas Corp.*, No. 337851, 2018 WL 5305098, at *1 (Mich. Ct. App. Oct. 25, 2018); *Young v. Nandi*, No. 292409, 2011 WL 1687624, at *2 (Mich. Ct. App. May 3, 2011). Similarly, although this Court has addressed a willful-disregard *claim* on a motion for summary judgment, *see Dow v. Rheem Mfg. Co.*, No. 09-13697, 2011 WL 4484001, at *20 (E.D. Mich. Sept. 26, 2011),[10] it has not addressed the willful-disregard *exception* on such a motion.

For these reasons, this Court is reluctant to determine the application of section 2946a before trial absent compelling authority. Accordingly, Defendant's motion for summary judgment will be held in abeyance with respect to the application of section 2946a, and the parties will be directed to file supplemental briefing.

## B.

The next issue is whether Defendant is entitled to summary judgment on Plaintiffs' failure-to-warn claim. In Michigan, negligent failure to warn is a type of products-liability claim with four elements: "(1) the defendant owed the plaintiff a duty to warn of the danger, (2) the defendant breached that duty, (3) the defendant's breach was the proximate and actual cause of the plaintiff's injury, and (4) the plaintiff suffered damages as a result." *Greene v. A.P. Prods., Ltd.*,

---

[10] *Rheem* was an unusual case, too, given that willful disregard is not an independent cause of action—as it was pleaded in *Rheem*—but a statutory exception to other statutory provisions. *See* MICH. COMP. LAWS § 600.2949a.

691 N.W.2d 38, 43 (Mich. Ct. App. 2004), *rev'd on other grounds*, 717 N.W.2d 855 (Mich. 2006); *accord* 20 THOMAS MUSKUS, MICHIGAN CIVIL JURISPRUDENCE, PRODUCTS LIABILITY, § 25 (2022).

To establish causation in the typical failure-to-warn case, a plaintiff must prove that she "would have altered [her] behavior in response to a warning." *Allen v. Owens-Corning Fiberglas Corp.*, 571 N.W.2d 530, 535 (Mich. Ct. App. 1997). Here, Defendant argues that Plaintiffs cannot meet their burden because even in the absence of trim-specific warnings, both Mr. Kaiser and Mr. Schultz knew that children should not play under the RV. ECF No. 38 at PageID.788–89.

Defendant's argument is unpersuasive. Although both parents knew it was unsafe for children to play under an RV, neither parent knew that the slide-out trim was dangerously sharp. *See* ECF No. 38-1 at PageID.827–28; ECF No. 38-2 at PageID.916. In fact, Mr. Kaiser testified that he did not warn K.K. to get away from the RV shortly before his injury because he believed that the RV was "kid friendly" and "family oriented." ECF No. 38-1 at PageID.827. Additionally, Dr. Hunt testified that generic parental warnings like "[b]e careful, don't go under there" are not as effective as hazard-specific warnings. ECF No. 44-4 at PageID.2115–16. From this evidence, a reasonable juror could infer that K.K.'s injury would have been avoided with trim-specific warnings.

Defendant also faults Mr. Kaiser and Mr. Schultz for not heeding the warning on M.S.'s toy car, which called for "direct parental supervision." ECF No. 38 at PageID.788. But their alleged failure to follow the toy car's instruction creates, at most, a question of fact as to causation. And even if Mr. Kaiser and Mr. Schultz were not directly supervising their kids,[11] and even if that lack

---

[11] According to Mr. Kaiser, he and Mr. Schultz were sitting near the RV and saw part of the buggy before it went under the RV. *See* ECF No. 38-1 at PageID.815–16.

of supervision played some role in the incident, a reasonable juror might still find that K.K.'s injury would not have happened but for Defendant's failure to warn. *See Allen*, 571 N.W.2d at 535.

For these reasons, Defendant's motion for partial summary judgment will be denied as to Plaintiffs' failure-to-warn claim.

### C.

The final issue is whether Defendant is entitled to summary judgment on Plaintiffs' NIED claim. Defendant argues that the NIED claim must be dismissed because Plaintiffs have not produced evidence of "actual physical harm from shock due to K.K.'s accident." ECF No. 38 at PageID.789.

To prevail on an NIED claim in Michigan, a plaintiff must prove (1) that a third person suffered a "serious" injury likely to cause "severe mental disturbance to the plaintiff," (2) that the shock from the injury caused "actual physical harm," (3) that the plaintiff is an immediate relative of the third person, and (4) that the plaintiff was "actually present at the time of the [injury] or at least suffer[ed] shock 'fairly contemporaneous[ly]' with [it]." *Wargelin v. Sisters of Mercy Health Corp.*, 385 N.W.2d 732, 735 (Mich. Ct. App. 1986) (quoting *Gustafson v. Faris*, 241 N.W.2d 208, 211 (Mich. Ct. App. 1976)).

In this case, both Mr. and Mrs. Kaiser testified that they experienced physical symptoms of distress due to K.K.'s injury, including nausea, shaking, and sweating. *See* ECF No. 38-3 at PageID.1104; Mr. Kaiser's Second Dep., ECF No. 42-15 at PageID.1859. Additionally, Mrs. Kaiser experienced heart palpitations, ECF No. 38-3 at PageID.1106, and Mr. Kaiser experienced sleep disturbances, ECF No. 42-15 at PageID.1860.

Defendant asserts that these symptoms are too "transitory" and "subjective" to support an NIED claim. ECF No. 43 at PageID.1885. But that assertion finds little support in Michigan law.

*See Fisher v. Lindauer*, 904 F. Supp. 2d 750 (W.D. Mich. 2012) (applying Michigan law and finding that plaintiff's evidence of physical injury was sufficient where she suffered from various symptoms, including "anxiety, hyperventilation, using oxygen, losing sleep, agitation, and panic"). Indeed, in Michigan, a plaintiff's burden to demonstrate physical injury is "slight," and there is a "strong presumption that the jury should decide whether a plaintiff's [NIED] claim is valid." *Maldonado v. Nat'l Acme Co.*, 73 F.3d 642, 647 (6th Cir. 1996) (quoting *Stites v. Sundstrand Heat Transfer, Inc.*, 660 F. Supp. 1516, 1527 (W.D. Mich. 1987)).

Because Plaintiffs have testified to physical symptoms of their distress, the issue of whether they suffered a sufficient physical injury is a triable question of fact. *See id.* at 647.

## V.

Accordingly, it is **ORDERED** that Defendant's Motion to Exclude Pavlansky, ECF No. 33, is **GRANTED AND DENIED IN PART**. Pavlansky may testify at trial, but, prior to trial, Defendant may depose Pavlansky in a manner consistent with the Federal Rules of Civil Procedure. Further, Plaintiffs must pay Defendant's reasonable costs and attorney fees in preparing the Motion to Exclude Pavlansky and in deposing him. Defendant is directed to file an accounting of such costs and fees no later than 30 days after the date of this Opinion or, if it deposes Pavlansky, 30 days after the deposition.

Further, it is **ORDERED** that Defendant's Motion to Exclude Dr. Shiener, ECF No. 37, is **GRANTED AND DENIED IN PART**. Dr. Shiener may testify regarding the PTSD diagnosis but may not testify regarding the PCS diagnosis.

Further, it is **ORDERED** that Defendant's Motion to Exclude Dr. Hunt, ECF No. 44, is **DENIED**.

- 25 -

Further, it is **ORDERED** that Defendant's Motion for Partial Summary Judgment, ECF No. 38, is **HELD IN ABEYANCE** as to the applicability of Mich. Comp. Laws § 600.2946a and **DENIED** in all other respects.

Further, it is **ORDERED** that the parties are **DIRECTED** to file supplemental briefs on or before **April 18, 2022**, addressing whether this Court may determine the applicability of MICH. COMP. LAWS § 600.2946a prior to trial. The briefs may be no longer than 15 pages.

Dated: March 22, 2022                          s/Thomas L. Ludington
                                               THOMAS L. LUDINGTON
                                               United States District Judge